Good morning, Your Honor. May it please the Court, Gene Barabia, on behalf of Mr. Rodriguez. Just hold it one second. I don't know if your co-counsel is situated yet. Sorry. I appreciate your excitement to run to the podium. No, thank you. Okay. Why don't you start again. Thank you. Again, good morning, Your Honor. May it please the Court, Gene Barabia, on behalf of Mr. Rodriguez. Good morning. The key issue before the Court is the district court's drug purity estimation. We believe in this case it was speculative. The evidence in the case is that my client had agreed on the telephone to make seven purchases of methamphetamine, and the district court estimated purity for those seven transactions based on what was found in one of the stash houses in the conspiracy on a single day without any evidence of what was found. It was on a single day that had nothing to do with the transactions. Right. It's a pretty simple issue. Right. That's correct. That's actually the crux of my argument. Right. And you say the Butler case supports it. Right. The Butler case, I think it's on point, and it has been cited with approval in the circuit. In light of that, does the Court have any... Well, no, I do have a question. So what do we make of the fact that the district court used the 42% pure figure rather than the 98% figure that applied to most of the recovered drugs? Doesn't the evidence suggest that the drugs the appellant purchased had a much higher purity than 42%? Well, I don't believe it suggests that. And if the Court is suggesting that 42% is giving my client a break, it would be true only if there was some way to show that what's seized on that day is representative for those seven days. Well, your client said in many telephone calls that he was ordering a G, which the agent testifies was methamphetamine ice, which by the guidelines is 80% pure. So it seems to me the judge gave your client a considerable break in terms of doing the best he could to find drug quantity. Well, Your Honor, I would actually respectfully disagree with that reading of the record because all the agent was testifying about is the linguistic origins of why traffickers sometimes use that term, term G, to refer to methamphetamine. He was never asked whether the purity of drugs that my client is talking about on the phone is referring to... Well, but wasn't there evidence in the record that your client only liked the good stuff, that your client didn't like, you know, the lesser quality stuff? Well, I think there was one conversation where he kind of added only the good stuff. But I would say that that does not, it's really irrelevant because for any number of reasons, most significant of which is that my client is very low on the food chain in this conspiracy. You know, he is a guy who's asking the mid-level dealers, and what's, you know, the pertinent evidence would be what was actually delivered to him. Now, that would be relevant, but... Isn't it also relevant that when they seized your client's source of supply, that even though it wasn't on the same date, but your client's source of supply was methamphetamine ice? I mean, it was a high purity level. Well, there was one piece that was high and one piece that was pretty low, but that's one day, Your Honor. But the quantity of the methamphetamine that was high, that was a much, much larger quantity. Right, Your Honor, but there are two ways to read it, and one of which would be that this was the big batch that was delivered to the dealer, which he will then later adulterate to lower purity. And who's to say that if law enforcement doesn't show up the day before or the day after, it's going to be totally different. And that gets back to the problem of estimating seven transactions based on one day that is in no way representative... But some estimation is allowed. It doesn't have to be exact, right? That's true. No, that's true. All right. So it's just a question whether this estimation is good enough. And the district judge did say, I'm going by clear and convincing evidence, which I'm not sure, I think the burden might be preponderance of the evidence. But anyway, that being the case, the district judge applied a higher standard, so we know what the district judge thought about how convinced she was. Right. But still, even allowing for the fact that some estimation is permissible, what's not allowed is basically pulling number over thin air. And when you have seven transactions and you have some abstract day on which you're relying and there's nothing to say that this is the representative day and this is the butler case that we're citing, there's nothing to say this is a representative day. Unfortunately, I think you're crossing over into essentially pulling a number out of thin air. Well, what should the district court have done and what should the government have done to try and put on more evidence in your view? Well, addressing the first question, I think this is a case where methamphetamine drug quantity has to be calculated as if it were a mixture of methamphetamine of unknown purity. The sentencing table provides for that. It's 2,000 kilos of marijuana as opposed to 20,000 kilos of marijuana. There is a calculation for that that in the end, as we explain on page 52, footnote 15 of the opening brief, you end up with offense level 26, not 28 that the district court calculated. And I don't think I'm in a position to tell Mr. Estrada how to prosecute this case. In general, I think that the evidence that was, for example, before the court in Lopez Montes was different because you had a person who agreed to deliver a particular quantity of methamphetamine and he was actually found in possession of that. Well, but Lopez Montes is more your guys, a dealer, Lopez Montes was a supplier, right? That's correct, yes. So it would be an extension, but there's nothing that says we can't extend it if we don't want to. Right. No, I mean, there is nothing in the text of Lopez Montes that would explicitly preclude the power in this case. But it would be an extension. It would be an extension. I think it would be against the logic of Lopez Montes as well as against the cases that say that there has to be a rational method of estimation. It just so happens, though, the co-defendant, I guess, did stipulate to the amount and it was, in fact, pretty high, right? Right. But we can't consider that. Right. In addition, co-defendant, I think both of them, they were both, the estimation was made based on the fact that they agreed to supply methamphetamine to Vasquez, who was one of the bigger dealers. So they stand in different shoes than my client. Okay. Do you want to save for rebuttal? Yes, Your Honor. Okay. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Martine Estrada on behalf of the United States. I think we've kind of put the parameters on here. I think you have, Your Honor. So if Lopez Montes is a little bit different, you're asking us to extend this? And what authority would allow the district court to make the same approximation for a buyer who is not found with any drugs? Well, Lopez Montes, the statement it makes about comparator evidence is very broad. It simply states we agree with our sister circuits that using purity of drugs actually sees to estimate purity of total quantity is appropriate. And that's based on the guidelines themselves, which state and actually mandate that the court is to approximate the quantity of drugs. With regard to the fact that Lopez Montes dealt with wholesale suppliers, it's also important to point out, as we did in the brief, that the cases relied upon by Lopez Montes, the Seventh Circuit case of Jarrett, Eighth Circuit case of Newton, both dealt with suppliers and distributors who were giving street-level amounts. In the case of Newton, we had eight balls, which are one-eighth of an ounce. In the case of Jarrett, we had half-gram quantities being distributed. But isn't it possible that there's just sometimes that maybe the government can't overcome the absence of evidence transaction by adopting something along those lines? I guess this case already went back one time, right? It did. So then I think the judge was trying to be, you know, very conservative in the approach. I'm not sure that it had to be by clear and convincing. I think it's probably preponderance. But that being said, isn't it possible that in some instances there just wouldn't be anything there, and so the defendant gets the benefit of it out there? I think the court is absolutely correct that there are possibilities there. However, in this case, wasn't this based on a single seizure from the stash house, the Cruz and Hernandez stash house, on August 30th? There were two batches that were seized, if I'm correct. And one was 98 percent pure, and the other was 42 percent pure. Correct. So this suggests to me that these methamphetamine mixtures coming from this house were all over the lot. How do we know there wasn't one below 42 on the six and seven transactions that we're looking at? Well, there's two important points, Your Honor. With regard to that evidence, there's two quantities. Right. But they aren't equal quantities. One is 269 grams, over half a pound. Right. And the other is 6.4 grams. Meaning it was adulterated? Meaning it was adulterated, correct. There was no cutting agent or MSM found at the stash location. And we have the fact, as Judge Bennett pointed out, that in the calls, this particular defendant asked for G, high-quality methamphetamine, which there was testimony in the record that that equates to crystal. But asking for it, does it mean that you get it? It does mean that you get it, based on the evidence and based on the clear and clearly erroneous standard, because there was a demonstration that this defendant was vocal about what he wanted and the quality of methamphetamine he wanted. There was at Excerpts of Record 99, Exhibit 23, where he said he wanted the good stuff. Also... Yeah, but where does it say that he got the good stuff? The fact that he didn't complain about it, whereas... Was he using it? The evidence on the record is that he was distributing it, Your Honor. So you're saying that he didn't get any complaints from the people who bought from him? Yes. Remember, everything is awfully attenuated in this chain. The government disagrees with that, because there's also evidence that in his dealings with Vasquez, the person he bought crack cocaine from, he complained about getting the bunk-ass methamphetamine. That's Exhibit 56, which he complained about on November 30, 2005. So he was vocal about the quality... That's somebody else. That's another person. But it shows that this defendant was vocal about the quality of methamphetamine that he wanted. Also, not only in terms of the quantity, he was also vocal with Cruz and Hernandez about how much methamphetamine he was getting. When he got 4.6 grams after ordering a quarter ounce, which would be 7 grams, he complained and asked Cruz to remedy the situation, which Cruz said he would. Another important point, I believe, Your Honor, is the context of the calls. The seizure on Cruz and Hernandez was on August 25, 2005. All of the calls where Rodriguez is asking for methamphetamine from Cruz and Hernandez occurred from June 2005 to August 2005. There's eight calls. Six of those eight calls are in August of 2005. So I think there is a very strong logical relationship to believe that the drugs in the stash location of Cruz and Hernandez, which were the only methamphetamine suppliers of Rodriguez, would have come from that stash. In addition, as pointed out, there's the language about what G is. And in my view, and I was there at the trial level, there's no real dispute about how clear the agent Connors was in terms of what it meant. He was asked the question, now is there any reason or logic as to why glass is often used to describe methamphetamine? And this is at Government's Excessive Records 117. He answered, yes, there is. Question, what is that reason or logic? He states, crystal methamphetamine is methamphetamine that is very pure. What does very pure mean? He goes on. It's 80% pure or better. And typically it comes in what looks like shards of glass or chips, ice chips. That's what it looks like. So the appearance is glass-like. So that's why glass would be a slang word used for methamphetamine. We have here Rodriguez asking for G, always using the same term. We have the fact that he's vocal in terms of complaining when methamphetamine isn't of high quality. We have the fact that he's vocal specifically with Cruz and Hernandez about getting good stuff and about when he doesn't get what he wants. And we have the time context in which six of his calls asked for methamphetamine are in the same month, August 2005, when the stash location is searched and when it's seized. So what's methamphetamine that's only 42% pure? That's not what Rodriguez asked for. Rodriguez didn't want that, and that wasn't part of the record. In addition, I should point out. And the judge used the lower quantity. I mean the lower purity. The judge certainly gave this defendant every benefit of the doubt, as the court will see from the record. At his initial sentencing, he was looking at a mandatory life sentence when the 851s was dismissed. At the resentencing, the court applied the clear and convincing standard, as Judge Callahan has pointed out, which the government doesn't believe was the correct standard. And the court applied the 42% amount, which the government didn't believe was the proper amount. And for the reason given that we had two quantities, but they weren't equal quantities. The only quantity which could have supplied quarter ounces and half ounces was the 269 grams. That was 90-some percent pure. Which was 98% pure. And the government argued vociferously for that 90%. But the court gave this defendant every benefit of the doubt and gave him the 42%. Now, if Butler is the appellant's best case, he didn't argue Butler at all in his briefs, I don't think. He did not. He filed a 28-J letter. Yeah, it's a 1995 case. It's a little old. And the government responded to that the next day, last Thursday. But it's important to keep in mind with regard to Butler. That is not a case dealing with the scope of an agreement. It deals with reasonable foreseeability. And Butler was very specific as to a group of co-conspirators that were dealing crack in a certain area in Alabama. And they were selling very small user amounts of crack. And the whole question in that case was reasonable foreseeability. We didn't deal with reasonable foreseeability here. It was all scope of the agreement. And in that case, the court applied a different method of approximation called the multiplier method by multiplying days of the conspiracy. So what is the standard of review that we apply to this determination? With regard to whether comparative evidence can be used, whether Lopez Montez applies, the government believes it's de novo. But with regard to the factual findings that were made by the district court, including the factual finding that G stood for 80% or better, and the factual finding that that amount of methamphetamine at Cruz and Hernandez' stash location was attributable to Rodriguez, that's a clearly erroneous standard. I do want to point out one other thing, Your Honors. In the prior appeal, the Maciel decision, it was not just Rodriguez appealing. There were two other defendants, Victor Herrera and Maciel. In that case, this court applied the comparator method, cited Lopez Montez. And in that case, there was no seizure from Herrera or Maciel. The court actually found that their agreement was for 453 grams. Yet the court multiplied by a 12% figure found at Vasquez's location in order to determine that the 50 gram actual threshold had been met. There was even less of a link between those particular seizures and the amounts discussed on the phone. No, because if we're dealing with unknown purity, what is the effect on the defendant? What's the difference in sentences? Sentence, yes. I'm not sure if it's between 28 and 26 or whatever. 28 and 26. Well, because there's been no, the court has affirmed and there's been no appeal of the crack determination, and he has a prior conviction, he would be subject to a 10-year mandatory minimum on the crack determination. So that stays and that can't be removed. The other side is showing us a bobblehead indicating disagreement with what you just said. I imagine there's a lot of disagreement. Regardless, that's what was argued before the district court and that's what I believe applies. But importantly – But what if it were, what if we didn't disagree with you and it went back and then it would be a 26? What does that look like? I'm not sure off the top of my head, Your Honor, but I believe the mandatory minimum of 120 months would apply for this particular defendant. But just to finish the point on Herrera and Maciel, which this court used comparative evidence, the seizures on Vasquez were in February and March of 2006. The calls involving Herrera and Maciel were in November and December of 2005. Well, I guess my argument – are you saying that's somehow law of the case? What's your point here? Well, the point is that this court has previously used comparative evidence more attenuated and affirmed the use of that comparative evidence as more attenuated. Here, it's a far tighter nexus. Was that a published decision? It is not, but it is the decision in this prior case. Okay, so it's three other judges that we don't have to follow if we don't want to, right? Certainly, Your Honor. But you're saying we see each other as all reasonable. Yes, I would think so, Your Honor. So that's the main point in terms of explaining that. All right. Well, you're in overtime, so I'm going to – unless my colleagues have any questions, thank you for your argument. Very good. Thank you, Your Honor. All right. Counsel, you have time to state your shaking head audibly. I believe that if you agree with our position that the sentencing range would be 120 to 150 months, offense level 26, criminal history category 6. And the reason I shook my head gesture, and I apologize, is that I believe that a mandatory minimum finding now requires a jury finding, and we don't have that anymore. So I think that there's no mandatory minimum at this point because there's no jury finding exposing my client to a specific quantity of methamphetamine. So what's your case on that? Is that your argument or is that your case? Well, it's my argument in response to what the government has argued in its argument because I don't believe this has been previously raised in the briefing. Okay. So it's a recent Supreme Court's case that just addressed application of a premeditated to a mandatory minimum. And I apologize, I don't have the name of the case. Is it the Allain case? I believe so. That's the one that just came out that applies a premeditated to a mandatory minimum. With respect to Judge Callahan's question concerning whether Butler is sort of a new case or a new argument, it's not a new argument. The argument is in the opening brief. The Culp's case, which cites Butler, is in the briefing. So the only thing that's new is I guess we focus on Butler via 28-J letter because I think it factually best summarizes our situation. Finally, my last point on— But Butler is a far different fact pattern. Well, I think it's similar on a salient issue with which the degree of speculation, degree of estimation that is allowed in drug quantity calculations. The difference is that the government outlines in its 28-J response letter, I think they're not material to what we're signing for. The point in that case and in our case is that we're taking one day that's not connected to the seven transactions at hand and we're extrapolating without any evidence that this day is representative for those seven other days. And my last point on—I'm sorry, I don't want to move away before. My last point on the point concerning what G means, this is an argument that the government has made. This is a forced time by my calculation that the government is making this argument. It was made an oral argument before Rodriguez won. It was made in addition for a hearing, and it was made before Judge Fischer, who said that she would accept it in clear and convincing. She would accept it at— Per ponderance. Per ponderance. And I would, I guess, respectfully disagree. I think because we're using acquitted conduct, you should use clear and convincing evidence. But regardless, this Court is certainly not required to do what Rodriguez won did. The law of the case is a discretionary doctrine, but my point is this is something that has been presented numerous times, and I just don't think the record supports it. It was just a general observation about what are the reasons for calling G G without any specific testimony or expert opinion concerning what my client is referring to. And in addition, of course, what he's asking for is really relevant given where he is in the food chain of this conspiracy. It's relevant what he received. That would be relevant. But we have no evidence of that. All right. Your time has expired. Thank you. Thank you both for your argument. This will stand submitted.
judges: Bennett, TROTT, CALLAHAN